## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA - FORT MYERS DIVISION

AWAIS M. KHAN, M.D.,

Plaintiff,                                        Case No.:
v.                                                Hon. Judge:

FLORIDA CANCER SPECIALISTS &
RESEARCH INSTITUTE, LLC; NATHAN
WALCKER; RICH MACCLARY; VALERIE
EASTWOOD; CHRIS PURDY; TARA RUSKA;
DENICE VEATCH AND ADAM DERRINGER,
in their individual and official capacities,

Defendants.

---

CHAPMAN LAW GROUP
Ronald W. Chapman Sr., M.P.A., LL.M.
FL Bar No: 646636
Sara A. Bazzigaluppi, Esq.
FL Bar No.: 1108266
6841 Energy Ct.
Sarasota, FL 34240
(941) 893-3449
rchapman@chapmanlawgroup.com
sbazzigaluppi@chapmanlawgroup.com

---

## COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

AWAIS M. KHAN, M.D. ("Plaintiff") brings this Complaint against

FLORIDA CANCER SPECIALIST & RESEARCH INSTITUTE, LLC ("FCS");

NATHAN WALCKER; RICH MACCLARY; VALERIE EASTWOOD; CHRIS

PURDY, TARA RUSKA; DENICE VEATCH; and ADAM DERRINGER, (herein

collectively "Defendants") because Defendants conspired to deprive Plaintiff of his

property to minimize the financial impact of the Deferred Prosecution Agreement ("DPA") FCS had with the United States Department of Justice Antitrust Division, Case No. 20-15 USC §1, filed in this very same District on April 30, 2020. In support of their Complaint alleging certain causes of action, Plaintiffs allege as follows:

## JURISDICTION AND VENUE

1. That this Court has jurisdiction of this action under the provisions of Title 28 of the United States Code, Sections 1331, and 1367(a) and also has pendent jurisdiction over all state claims that arise out of the nucleus of operative facts common to Plaintiff's federal claims, a violation of 18 U.S.C. §§ 1961-1968 and 26 U.S.C. §§7201, 7206, 7207.

2. Plaintiff brings this action against the individual Defendants in both their individual capacity and official capacity as officer, members and decision makers of Defendant FCS.

3. Each action taken by the individual Defendants was taken with the authority vested in it by Defendant FCS.

4. The amount in controversy exceeds Seventy-Five Thousand Dollars ($75,000.00).

5. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b).

## PARTIES

6. Plaintiff is a Florida resident domiciled in Palm Coast, Florida. He is a Florida licensed medical oncologist, board certified in medical oncology and internal

medicine. From March 31, 2019 until August 2, 2021, Plaintiff was a full-time employee of Defendant FCS, providing hematology and oncology services at FCS's office located at Advent Health Palm Coast with address 61 Memorial Medical Parkway, Palm Coast, FL 32164.

7. Defendant FCS is a Florida professional limited liability corporation with its principal place of business located at 4371 Veronica South Shoemaker Boulevard, Fort Myers, FL 33916. FCS is the largest independent medical oncology/hematology practice in the United States with over one hundred eighty (180) physicians, one hundred thirty (130) nurse practitioners, and over ninety (90) locations in the FCS network.

8. On information and belief, Defendant NATHAN WALCKER is an officer and/or a senior executive for FCS, operating defendant corporation subject to the laws of the State of Florida and residing in the State of Florida. On information and belief, Mr. Walcker is the Chief Executive Officer ("CEO") of FCS.

9. On information and belief, Defendant JASON COE, is an individual operating defendant corporation subject to the laws of the State of Florida and residing in the State of Florida. On information and belief, Mr. Coe is the Chief Operating Officer ("COO") of FCS.

10. On information and belief, Defendant JOYCE NELSON is an individual operating defendant corporation subject to the laws of the State of Florida and

residing in the State of Florida. On information and belief, Ms. Nelson is the Chief Administrative Officer ("CAO") of FCS.

11. On information and belief, Defendant RICH MACLCARY is an individual operating defendant corporation subject to the laws of the State of Florida and residing in the State of Florida. On information and belief, Mr. McClary is the Chief Financial Officer ("CFO") of FCS.

12. On information and belief, Defendant VALERIE EASTWOOD is an individual operating defendant corporation subject to the laws of the State of Florida and residing in the State of Florida. On information and belief, Ms. Eastwood is the Chief Compliance Officer ("CCO") of FCS. *See below.*

13. On information and belief, Defendant CHRIS PURDY, CPA, MBA, is an individual operating defendant corporation subject to the laws of the State of Florida and residing in the State of Florida. On information and belief, Mr. Purdy is the Vice President of Internal Audit & Process Controls of FCS.

14. On information and belief, Defendant TARA RUSKA, CPA, MSAT is an individual operating defendant corporation subject to the laws of the State of Florida and residing in the State of Florida. On information and belief, Ms. Ruska is the Controller and Vice President of FCS. Ms. Ruska was also directly involved in the unlawful acts alleged herein. *See below.*

15. On information and belief, Defendant DENICE VEATCH is an individual

operating defendant corporation subject to the laws of the State of Florida and residing in the State of Florida. On information and belief, Ms. Veatch is Director of Financial Reporting and Analysis for FCS. Ms. Veatch was also directly involved in the unlawful acts alleged herein. *See below.*

16. On information and belief, Defendant ADAM DERRINGER is an individual operating defendant corporation subject to the laws of the State of Florida and residing in the State of Florida. On information and belief, Mr. Derringer is Associate Director of Financial Reporting and Analysis for FCS. Mr. Derringer was also directly involved in the unlawful acts alleged herein. *See below.*

17. Various persons, agents, and individuals not named as Defendants in this lawsuit, and the identities of which are presently unknown, have participated as co-conspirators with Defendants in the offenses alleged in this Complaint, and have performed acts and made statements in furtherance of the conspiracy.

## **GENERAL ALLEGATIONS**

18. On January 4, 2017, two (2) former employees of FCS filed a whistleblower action alleging that beginning in 2010, FCS submitted false claims to the United States government healthcare programs, Medicare, and Medicaid, and engaged in a *quid pro quo* kickback scheme in violation of the Sherman Antitrust Act, 15 U.S.C. §§ 1 – 7.

19. As a result of the whistleblower action, the United States Department of Justice

Antitrust Division filed suit against FCS in the United States District Court, Middle District, Fort Myers Division in Case No. 20-15 U.S.C. §1.

20. On April 30, 2020, FCS signed a deferred prosecution agreement ("DPA"). (**Exhibit A**). The terms of the DPA are in pertinent part:

> **FCS acknowledges that it is legally responsible for the acts of its partners, members, officers, directors, employees, and agents that give rise to the charge in the Information.** FCS admits, accepts, and acknowledges that the facts set forth in the Statement of Facts are true and accurate.

> Should FCS learn of or possess credible evidence or allegations of criminal violations of United States law by FCS or its subsidiaries or corporate affiliates, or **by any present or former officers, directors, employees, or agents**, FCS shall promptly report such evidence or allegations to the United States.

> The United States and FCS agree that FCS will pay a monetary penalty in the amount of $100,000,000, plus interest beginning June 1, 2020.

> **FCS acknowledges that no tax deduction may be sought, and agrees that no tax deduction will be sought, in the United States, or elsewhere in connection with the payment of any part of this penalty**.

> **FCS agrees to waive and not enforce any and all non-compete, non-solicitation, and/or non-interference provisions restricting competition** with FCS in the provision of oncology services or solicitation of FCS' employees in any contract or agreement that would otherwise apply **to any current** or former partners, members, officers, directors, **employees**, and agents of FCS or any of its subsidiaries or corporate affiliates who,

6

> during the Term of this Agreement, join an oncology practice in Southwest Florida or open an oncology practice in Southwest Florida.

(**Exhibit A**) (emphasis added).

21. Pursuant to the DPA, the monetary penalty is a fine defined as:

> $100,000,000, plus interest beginning June 1, 2020 and computed daily at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding June 1, 2020, to the United States Treasury" to be paid in installments "$40,000,000 by June 1, 2020; an additional $10,000,000 plus interest by June 1, 2021; an additional $16,627,384 plus interest by December 31, 2021; an additional $16,627,384 plus interest by December 31, 2022; and an additional $16,745,232 plus interest by December 31, 2023" or in full at any time.

(Hereinafter defined as "The Fine"). (**Exhibit A**).

22. On March 31, 2019, prior to the signing of the DPA, Plaintiff and FCS entered into a physician employment agreement ("Employment Agreement"). (**Exhibit B**). The terms of the Employment Agreement are in pertinent part:

- Agreement Term is for a period of two (2) years at which point it automatically renews.

- FCS shall provide Plaintiff with such office, furniture, fixtures, equipment, supplies, and para-professional and non-professional services.

- Due to the DPA terms formalized on April 30, 2020, all restrictive covenants under Paragraph 16 of the Employment Agreement are void in Southwest Florida as

7

of this date. However, for reasons stated herein, FCS should be enjoined in enforcing them throughout Florida.

- FCS shall pay Plaintiff base salary of $475,000.00 per year.

- In addition to base salary, FCS may pay a semi-annual discretionary performance bonus up to 70% in excess of the compensation that would have been payable had he been a Member of the FCS during the applicable fiscal period (or portion thereof) over the sum of $475,000.00 plus "direct expenses" which include: medical malpractice insurance costs, transcription or dictation services, reimbursable business expenses, continuing education allowance, moving or relocation expenses, credentialing fees and renewal fees for licenses, employee benefits, taxes and withholdings, other costs that are **"solely and directly related or attributable" to Plaintiff's role as employee of FCS and "not to [FCS's] business or medical practice in general or as a whole."**

23. There are two (2) loans A & B that FCS used as tools to unlawfully convert Plaintiff's post tax compensation – transferring tax free monies back to Defendants.

24. "Loan A" was used to reduce the bonus pool. Defendants unlawfully began deducting Loan A from Plaintiff's compensation in June of 2019 and did not reveal the nature of the deduction to Plaintiff until November 2019 when Plaintiff questioned the same. The amount of the alleged Loan A was Four Hundred Twenty-Eight Thousand Seventy-Two Dollars ($428,072), plus five percent (5%) annual interest. Loan A appears on the Excel Spread Sheets for 2019, 2020,

and 2021 on the Regional Consolidated Tab: in 2019, $56,547.18; in 2020, $96,939.00; in 2021, $30,887 (last known amount April). These were taken from the Bonus Pool prior to pay in an effort to reduce earnings. These items do not appear on paystubs. The total amount taken since 2019 was One Hundred Eighty-Four Thousand Three Hundred Seventy-Three Dollars ($184,373) PLUS whatever was added to the excel spreadsheets for the April, May, June, and July payments. (**Exhibit C**).

25. The consolidated Income Statement comparing Fiscal Year 2020 Versus 2019, shows deductions of Eight Thousand Seventy-Eight Dollars and Twenty-Four Cents ($8,078.24) per month starting on June 1, 2019. (**Exhibit C**).

26. "Loan B" was used to repay the DPA fine assessed against FCS. Loan B on the paystub was called "Deduction for Physician Loan."

27. FCS implemented a second loan referred herein as "Loan B." As evidenced by the attached paystub for November 29, 2020, through December 12, 2020, pay period, FCS deducted Seventy-Three Thousand Eight Hundred Nineteen Dollars ($73,819.00) from Plaintiff's performance bonus of Ninety-Seven Thousand Six Hundred Eleven Dollars and Nine Cents ($97,611.09). (**Exhibit D**). As evidenced by the attached paystub for the November 29, 2020 through December 12, 2020 pay period, Plaintiff was required to pay taxes on the full performance bonus of Ninety-Seven Thousand Six Hundred Eleven Dollars and Nine Cents

($97,611.09). Defendants clawed back the post-tax amount Seventy-Three Thousand Eight Hundred Nineteen Dollars ($73,819.00), falsely claiming it was part of Loan B repayment. (**Exhibit D**). Similar accounting can be noted in the paystubs from March through June of 2021, although it appears that on occasion the "loan" was deducted from Plaintiff's base salary post-taxes. (**Exhibits E through H**). FCS intentionally uses the term "LOAN" in many different ways to cause confusion with the respective employee and make the deduction seem reasonable or a proper obligation. Loan B did not appear until after the DPA was executed. (**Exhibit I**).

28. FCS continued to take/convert monies from Plaintiff to re-pay Loans A & B into 2021. As provided by FCS, the "loan" repayments from May 2020 to April 2021 amounted to Ninety-Five Thousand Five Hundred Thirteen Dollars ($95,513). (**Exhibit J**). Plaintiff paid Seventy-Three Thousand Eight Hundred Nineteen Dollars ($73,819.00) from May to December 2020; Fifty-Two Thousand Two Hundred Thirty Dollars and Eighty-Eight Cents ($52,230.88) from January through May 2021. (**Exhibits E and G**). Total deductions/conversion was approximately One Hundred Twenty-Six Thousand Forty-Nine Dollars and Eighty-Eight Cents ($126,049.88) as of May 2021. Monthly deductions of Seven Thousand Seven Hundred Twenty-Two Dollars ($7,722), continued through termination bringing total deductions to approximately One Hundred Forty-One

Thousand Four Hundred Ninety-Three Dollars and Eighty-Eight Cents ($141,493.88). (**Exhibit J**).

29. Defendants conspired to impose a fictitious loan (unlawful debt) on Plaintiff and other employees, forcing the Plaintiff to pay taxes on monies that were taken from him. The alleged loan (unlawful debt/unjust burden) began after the Defendants entered into the DPA.

30. Said conspiracy and act of conversion, allowed Defendants to shift the tax burden of The Fine to the employee, as an unlawful debt and unjust burden.

31. As explained above, FCS was solely responsible for the repayment of The Fine as defined and pursuant to the DPA. *See above.*

32. Despite there being absolutely no mention of fine allocation in the Employment Agreement, FCS told Plaintiff that he (along with all other physician employees) was responsible for The Fine. (**Exhibit W**).

33. As reflected in the Consolidated Income Statement comparing Fiscal Year 2020 Versus 2019, FCS allocated a "Central Service Fee" which is part of the "Site Expenses" as Plaintiff's alleged portion of The Fine. (**Exhibit K, line item 189**).

34. In fact, per review of the income statements, The Fine was initially imposed in July 2020 and every month thereafter (excluding December 2020) for a total of Seventy-Three Thousand Eight Hundred Nineteen Dollars ($73,819) by the end of the year, 2020. (**Exhibit L, line item 21**). The "fine" deduction was instituted

two (2) months after FCS signed the DPA.

35. FCS continued to allocate a portion of The Fine against Plaintiff in 2021 for a total of Sixty-Four Thousand Six Hundred Forty-Two Dollars ($64,642). (**Exhibits M through O**). Defendants continued to allocate The Fine until Plaintiff's resignation/termination in early August 2021. Plaintiff is not in possession of documents at this time evidencing the precise fine amounts deducted June through July 2021, however, Plaintiff estimates an amount of Twenty-Five Thousand Eight Hundred Fifty-Six Dollars and Eighty Cents ($25,856.80) by taking the average amount of the prior months January through May 2021 ($12,928.40). (**Exhibits M through O**). This brings the total fine allotment to an estimated One Hundred Sixty-Four Thousand Three Hundred Seventeen Dollars and Eighty Cents ($164,317.80). (**Exhibits L and O**).

36. Defendants conspired to the allocation of The Fine on Plaintiff, forcing Plaintiff and others to pay taxes on monies that were taken from them to repay the DPA settlement.

37. Said conspiracy and act of conversion, allowed Defendants to shift the burden of The Fine payment to Plaintiff and others.

38. Said conspiracy and act of conversion allowed Defendants to transfer monies to the government in repayment of The Fine that were derived from imposing an unlawful debt and unjust burden on Plaintiff and others.

12

39. Defendants used the tax code to force Plaintiff and others to pay taxes, on monies that were taken from Plaintiff and others, and an unlawful debt/unjust burden a business tax deduction for Defendants in violation the DPA. This allowed Defendants to pay the DPA settlement after obtaining a tax deduction in violation of same.

40. Despite there being absolutely no mention of a mandatory or compulsory "charitable contribution" in the Employment Agreement, FCS simply deducted charitable contributions from Plaintiff's earnings without asking. (**Exhibits P and Q**). Per review, this appears to be a monthly Three Hundred Fifty Dollar ($350.00) deduction. (**Exhibits P and Q**).

41. Per FCS, this "charitable contribution" is an automatic deduction from Plaintiff and a benefit to the alleged FCS Foundation. (**Exhibits R and S**). Plaintiff never authorized this. (**Exhibit T**). Total amount of "charitable contributions" deducted from October 2020 through July 2021 amounts to an estimated Three Thousand Five Hundred Dollars ($3,500). (**Exhibits P and Q**).

42. Defendants agreed to impose "charitable contributions" on Plaintiff as an unlawful debt/unjust burden, forcing the Plaintiff and others to pay taxes on monies that were taken from the employee and given to Defendants and entities under their control.

43. Said conspiracy and act of conversion, allowed Defendants to shift the burden of

The Fine payment to the Plaintiff and others, or in the alternative to enrich themselves and Defendant FCS.

44. Said conspiracy and act of conversion allowed Defendants to transfer monies to the government in repayment of The Fine that were derived from imposing an unlawful debit/unjust burden on employees and using the tax code to force employees to pay the taxes, achieving a business tax deduction for Defendants in violation the DPA.

45. Plaintiff earned a "Medicare Quality Initiatives" ("OCM") bonus of Thirty-Nine Thousand One Hundred Fifty Dollars and Fifty-Six Cents ($39,150.56), in the calendar year 2020. The OCM that was required to be paid directly to the physician in recognition of quality work. The bonus was paid by Medicare. Without authority, FCS deducted the full bonus of amount of Thirty-Nine Thousand One Hundred Fifty Dollars and Fifty-Six Cents ($39,150.56), plus Eighteen Thousand Four Hundred Sixty-One Dollars and Sixteen Cents ($18,461.16) as an alleged negative performance bonus. (**Exhibit U**). On information and belief, the portion deducted was used to pay a portion of The Fine.

46. On or about March 31, 2021, Plaintiff received Twenty-Nine Thousand Two Hundred Seventy-Three Dollars and Forty-Nine Cents ($29,273.49) via direct deposit. (**Exhibit U**). However, then FCS informed Plaintiff that they were

reassigning the funds as "taxable" and required the money to be returned. Defendants took the money from Plaintiff via unlawful deduction from his compensation by April 16, 2021. (**Exhibit V**). In addition, FCS clawed back the nearly Twenty-Nine Thousand Dollars ($29,000.00) without explanation. On information and belief, the portion deducted was used to pay a portion of The Fine. All of the above can be described as an unlawful debt/unjust burden.

47. Defendants agreed to recoup monies from Plaintiff, forcing Plaintiff to pay taxes on monies that were taken from him.

48. Said conspiracy and act of conversion, allowed Defendants to shift the burden of The Fine payment to Plaintiff and others.

49. Said conspiracy and act of conversion allowed Defendants to transfer monies to the government in repayment of The Fine that were derived from imposing an unlawful debt/unjust burden on Plaintiff and others; and using the tax code to force Plaintiff and others to pay the taxes, achieving a business tax deduction for Defendants in violation the DPA.

50. Plaintiff inquired as to the above loans, fines, deductions, and recoupments several times with FCS and was clearly told that all the above are imputed onto all physician employees for repayment of The Fine. (**Exhibit W**).

51. According to FCS, these Plaintiff is responsible for the taxes associated with these amounts. (**Exhibit X**). Plaintiff was required to assume the full tax burden

for his combined compensation of salary plus bonus; however, Plaintiff's combined compensation of salary plus bonus was systematically reduced by the unlawful debts, fines, deductions, and recoupments. (**Exhibits W and X**).

52. Said conspiracy and act of conversion allowed Defendants to transfer monies to the government in repayment of The Fine that were derived from imposing an unlawful debt/unjust burden on Plaintiff and others and using the tax code to force employees to pay the taxes, achieving a business tax deduction for Defendants in violation the DPA.

53. Defendants engaged in the acts described above to ensure available revenue to pay the government fine and to ensure available revenue to pay Defendants, its members and senior employees.

54. The acts described above were implemented and carried out to increase available tax-free cash to the Defendants, to enrich their own pockets and support the Defendants' business, namely FCS.

55. On or about December 30, 2020, FCS approached Plaintiff with a New Employment Agreement with added additional terms. Plaintiff rejected the terms of the New Agreement. In retaliation thereof, FCS unlawfully recouped Forty-Nine Thousand Eight Hundred Twenty-Nine Dollars ($49,829) from compensation, presumably to pay The Fine. (**Exhibit Z**).

56. Frustrated by the unlawful acts of Defendants, Plaintiff terminated his

employment relationship with FCS on July 16, 2021. (**Exhibit AA**). In the Notice of Resignation, Plaintiff notified FCS of their unlawful practices. (**Exhibit AA**).

57. On or about August 2, 2021, Plaintiff received a Letter of Termination from FCS's CEO, Defendant Nathan Walcker, in response to his resignation. (**Exhibit BB**). The letter states in pertinent part that Plaintiff violated the terms of the Employment Agreement by giving thirty (30) days' notice instead of the required ninety (90) days. Therefore, FCS refused Plaintiff's resignation and instead terminated him.

58. Defendants threatened either implicitly or directly to enforce severe restrictive covenant restrictions if the Plaintiff left employment regardless of the reason. Defendants threatened and stated they would, through all means available, enforce restrictive covenants, thereby eliminating Plaintiff's opportunity to work.

59. Defendants also called Advent Hospital and told them that Plaintiff had resigned from the medical staff and all medical staff appointments. Said act was done as a retaliatory measure for Plaintiff disputing the illegal activity. Plaintiff did not authorize the action and did not resign from Advent Hospital's medical staff.

## COUNT I – BREACH OF DPA

60. Plaintiff realleges and incorporates by reference, as if fully set forth herein, the allegations in Paragraphs 1 through 59 above.

### a. *Plaintiff is a Third-Party Beneficiary of the DPA*

61. While the DPA is between FCS and the federal government, it was done in consideration of the public, but also current employees who were otherwise subject to non-compete agreement with FCS. (**Exhibit A**). The DPA was filed on April 30, 2020, and at the time Plaintiff was a current employee having signed his Employment Agreement with FCS on March 31, 2019. (**Exhibits A and B**).

62. Plaintiff argues that he is a third-party beneficiary of the DPA. Under Florida law:

> The doctrine of third-party beneficiaries provides that under certain circumstances, a person may sue to enforce a contract, even though the person is not a party to the contract. See 11 Fla. Jur. 2d Contracts § 206, at 406-07 (2008). […] "To establish an action for breach of a third party beneficiary contract, [the third-party beneficiary] must allege and prove the following four elements: '(1) existence of a contract; (2) the clear or manifest intent of the contracting parties that the contract primarily and directly benefit the third party; (3) breach of the contract by a contracting party; and (4) damages to the third party resulting from the breach.'"

*Mendez v. Hampton Court Nursing Ctr., LLC,* 203 So. 3d 146, 142-49 (Fla. 2016) (quoting *Foundation Health v. Westside EKG Assocs.,* 944 So. 2d 188, 194-95 (Fla. 2006)).

63. The specific intent was for FCS to absorb the full cost of the monetary penalty and not find creative ways of placing that burden onto their employees, especially those who were not even involved in the anti-competitive scheme that brought

about the DPA in the first place. Additionally, the manifest intent of the DPA is to protect employees against anti-competitive behavior by FCS.

> Under Florida law, a court cannot refuse enforcement of a restrictive covenant by a third-party beneficiary if "the restrictive covenant expressly identified the person as a third-party beneficiary of the contract and expressly stated that the restrictive covenant was intended for the benefit of such person.

*Nuvasive, Inc. v. Absolute Med., LLC*, No. 6:17-cv-2206-Orl-41GJK, 2019 U.S. Dist. LEXIS 62896, at *14-15 (M.D. Fla. Feb. 11, 2019) (*internal citation omitted*).

64. Here, Plaintiff was expressly named as current employee of FCS. in fact, the federal government also specifically required FCS to provide a copy of said DPA to all current employees. (**Exhibit A**). In *Whitehaven S.F., LLC v. Spangler,* the Second District Court of Appeals of the United States looked at "Assurance of Discontinuance" which is a is a regulatory mechanism, similar to a deferred-prosecution agreement." *Whitehaven S.F., LLC v. Spangler*, 633 F. App'x 544, 546 (2d Cir. 2015). In this case, the court was trying to determine whether an appellant was the intended third-party beneficiary of an agreement between appellee and state attorney general.

> The Attorney General reasons that Assurances are interpreted as contracts, see *MBIA Inc. v. Fed. Ins. Co.*, 652 F.3d 152, 171 (2d Cir. 2011), and that contracts in New York may have intended third-party beneficiaries, see *BAII Banking Corp. v. UPG, Inc.*, 985 F.2d 685, 696-97 (2d Cir. 1993). While government contracts, including

Assurances of Discontinuance, must satisfy a more stringent test before a court may conclude that they create third-party beneficiaries, a member of the public may be an intended third-party beneficiary of a public contract, in the Attorney General's view, where (a) the contract expressly and primarily benefits an identified segment of the public, and (b) the promisor must render its performance directly to the third party.

*Whitehaven S.F., LLC v. Spangler*, 633 F. App'x 544, 547 (2d Cir. 2015) (*internal citation omitted).*

65. For this reason, Plaintiff was an intended third-party beneficiary of the DPA between FCS and the federal government.

66. For the reasons stated above, FCS intentionally breached the DPA and did so by evading the full burden of the monetary penalty imposed and shifting costs onto Plaintiff when: 1) they created and imposed a fictitious loan (unlawful debt) which reduced Plaintiff's bonus after taxes; 2) they improperly assessed a fine against Plaintiff's clinic expenses after taxes, thus reducing his salary; and 3) they arbitrarily imposed, without permission by Plaintiff, monthly charitable contributions to their own foundation as an expense, and found other ways to recoup monies for the repayment of The Fine and for their own enrichment and the enrichment of FCS.

67. Pursuant to the DPA, FCS was not allowed to shift the financial burden and tax burden of The Fine onto their physician employees. Therefore, Plaintiff should

be entitled to compensatory damages and full restitution of monies unlawfully taken by FCS.

WHEREFORE, Plaintiff asks this honorable court to find that FCS breached the DPA, harming Plaintiff as an intended beneficiary of the DPA, and grant compensatory damages, restitution, and enjoin FCS from the enforcement of any restrictive covenants.

## COUNT II – INJUNCTIVE RELIEF PROHIBITING ENFORCEMENT OF RESTRICTIVE COVENANTS

68. Plaintiff realleges and incorporates by reference, as if fully set forth herein, the allegations in Paragraphs 1 through 59 above.

69. Pursuant to Fed. R. Civ. P. 65, Plaintiff requests an injunction prohibiting FCS from enforcing any restrictive covenants against Plaintiff.

70. The restrictive covenants, in Plaintiff's contract, with FCS are unjust and used by FCS as a method of coercion to force employees, such as Plaintiff, to comply with their unlawful deductions and forced payment of fines, as described in detail above.

71. Plaintiff satisfies all the elements necessary for the imposition of a preliminary injunction:

> The grant or denial of a motion for preliminary injunction is a decision within the discretion of the trial court . . . . That discretion is guided by four requirements for preliminary injunctive relief: (1) a substantial likelihood

21

that the movants will ultimately prevail on the merits; (2) that they will suffer irreparable injury if the injunction is not issued; (3) that the threatened injury to the movants outweighs the potential harm to the opposing party; and (4) that the injunction, if issued, would not be adverse to the public interest. *Haitian Refugee Center, Inc. v. Nelson*, 872 F.2d 1555, 1561 (11th Cir. 1989). The Court must find in favor of movant on all four factors in determining whether or not a preliminary injunction should be issued. The elements for a temporary restraining order are essentially the same, except that "the motion must be supported by allegations . . . that such [irreparable] injury is so imminent that notice and hearing on the application for preliminary injunction is impractical if not impossible.

*Hernandez v. Bd. of Regents by Univ. of S. Fla.*, 11 Fla. L. Weekly Fed. D 60 (U.S. M.D. Fla. 1997) (*internal citation omitted*).

72. Plaintiff has a substantial likelihood of success on the merits. Here, the evidence clearly shows that the DPA prohibits FCS from seeking any form of tax deductions in repayment of The Fine. (**Exhibit A**). The evidence also clearly demonstrates that FCS instead allocated The Fine on all their employee physicians. (**Exhibits C through BB**).

73. Plaintiff was forced to agree to the egregious and unlawful/debt/loan collection practice of Defendants. When Plaintiff refused to agree to the new contract, that embodied these deductions, he was told the new contract was final and he was required to sign it. (**Exhibit Y**).

74. Plaintiff refused to sign the new contract, the deductions continued, and he was constructively discharged from his employment. Plaintiff had no alternative,

other than to agree to illegal conduct and forced debt collection or resign.

75. Plaintiff chose to resign, and Defendants used the restrictive covenants to cause irreparable injury to Plaintiff.

76. Defendants use restrictive covenants to force compliance with FCS schemes. The DPA also saw this and forced FCS to agree not to enforce the restrictive covenants in Southwest Florida. The same rationale is present here. For this reason, Plaintiff is likely to succeed on the merits of this claim.

77. FCS rejected Plaintiff's Letter of Resignation and instead terminated him immediately. (**Exhibits AA and BB**). Said termination will be a forever negative mark on Plaintiff's record, causing irreparable injury when applying for future employment.

78. Defendants continue to undermine his ability to continue to work with Advent Hospital.

79. Defendants are working to force Advent Hospital to either remove him from the medical staff or discipline him for not taking call.

80. Defendants are using the restrictive covenants to prevent Plaintiff from taking call; irreparably harming his ability to practice medicine and his standing in the community.

81. If Plaintiff is removed from the medical staff, his medical license will be in serious jeopardy by the Florid Board of Medicine.

82. He would be reported to the National Practitioner Date Bank and consequently his Medicare/Medicaid (government insurance) billing privileges would be denied.

83. Plaintiff's entire life would be uprooted and his profession of being as a medical oncologist serving some of the most ill persons in our community would be ended.

84. But for the egregious actions of Defendants, Plaintiff would not have been constructively forced out of Defendant FCS, and consequently the irreparable harm to his practice, his family and himself would not be taking place.

85. All Defendants are conspiring to harm Plaintiff and conspired to impose the unlawful debt/loans on Plaintiff to repay a government debt and/or to enrich themselves.

86. FCS' threatened enforcement of the restrictive covenant is an enforcement mechanism that irreparably harms Plaintiff and other physicians from obtaining employment in a very specialized field. The restrictive covenants also serve as a mechanism to restrain trade and ensure FCS keeps a strangle hold on all oncology services in Florida.

87. While the DPA limits the restrictive covenants to Southwest Florida, the Defendants' Letter of Termination clearly show their intent to punish Plaintiff for contesting their unlawful acts and destroy his reputation in the community. FCS

24

will stop at nothing to seek competitive advantage, and this is not limited to Southwest Florida. A temporary injunction which prohibits FCS from enforcing any type of restrictive covenant against Plaintiff is the only way to ensure FCS will not continue their retaliatory efforts and maintain an unfair economic advantage in restraint of trade.

88. The evidence also shows that the threat of injury to Plaintiff outweighs the potential harm to FCS. Injunctive relief will not unreasonably harm FCS. FCS still continues to manage an extremely large network of physicians and clinics. FCS will still be able to compete in the same area as Plaintiff.

89. Pursuant to Fed. R. Civ. P. 65, this Court may issue a temporary restraining order and injunctive relief if: a verified complaint clearly shows that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and upon certification that notice was provided and why it should not be required.

90. Plaintiff satisfied the element for preliminary injunction, *supra*. *See Hernandez v. Bd. of Regents by Univ. of S. Fla.*, 11 Fla. L. Weekly Fed. D 60 (U.S. M.D. Fla. 1997).

WHEREFORE, Plaintiff asks this honorable Court to find:

91. Defendants engaged and conspired to engage illegal/egregious acts and uses restrictive covenants to force compliance with defendants actions;

25

92. Plaintiff suffered irreparable injury;

93. Plaintiff has a likelihood of success on his claims as stated in this Complaint and that he was constructively discharged;

94. The interest of the public would be served with a permanent injunction against Defendant FCS' enforcement of restrictive covenants; and

95. Enjoining FCS from enforcing the restrictive covenants would not be averse to public interest. FCS has complete disregard for authority and the laws of this country as well as complete disregard for the continuity of care of their patients. The DPA was precisely put in place to protect Florida citizens from FCS continued pattern of unlawful behavior. Allowing FCS to continue restricting commerce would allow FCS to return to their methods of aggressively restraining the ability of medical oncologists, not associated with FCS, to serve the community. In the interest of justice, fairness, and for the safety of the public, injunctive relief should be granted.

WHEREFORE, Plaintiff asks this honorable court to enter an injunction prohibiting FCS from enforcing any restrictive covenant against Plaintiff and all such other relief deemed appropriate by the Court.

## COUNT III – VIOLATION OF RICO

96. Plaintiff realleges and incorporates by reference, as if fully set forth herein, the allegations in Paragraphs 1 through 59 above.

26

97. RICO provides for a private right of action by those aggrieved by the criminal acts of the enterprise:

> In order for a pattern of racketeering activity to be a cognizable cause of civil RICO injury to a private plaintiff, one or more of the predicate acts must not only be the 'but for' cause of the injury, but the proximate cause as well.

*Fla. Evergreen Foliage v. E.I. du Pont de Nemours & Co.,* 165 F. Supp. 2d 1345, 1351 (S.D. Fla. 2001) (*internal citations omitted*).

### a. FCS deals in Interstate Commerce

98. Racketeer Influenced and Corrupt Organizations ("RICO") Act was specifically created to allow the federal government to prosecute criminal acts committed by an ongoing criminal organization, and to allow for civil claims by those aggrieved. 18 U.S.C. § 1962.

> Section 1962(c) makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or unlawful collection of debt.

*Roche Diagnostics Corp. v. Priority Healthcare Corp*., 407 F. Supp. 3d 1216, 1237 (N.D. Ala. 2019).

99. As explained above, while Defendants primary place of business is Florida, FCS is the largest independent medical oncology/hematology practice in the United States with over ninety (90) locations. Their services span beyond the

geographical confines of this State and are intended to reach patients affected by cancer across the Unites States. For this reason, they are engaged in intrastate commerce.

100. To establish a claim under RICO, four elements must be present:

> In all, the claim requires four elements: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.

*Roche Diagnostics Corp. v. Priority Healthcare Corp*., 407 F. Supp. 3d 1216, 1237 (N.D. Ala. 2019) (*internal citations omitted*).

     i.   <u>Conduct</u>

101. The evidence demonstrates that Defendants engaged multiple acts, all with the design to shift the economic burden of The Fine onto Plaintiff and through retaliation force compliance by Plaintiff and others. Due to the repeated, calculated, and systematic nature of Defendants' actions, their behavior is not a one-off, rather intentional conduct. *See generally Sedima v. Imrex Co.*, 473 U.S. 479, 105 S. Ct. 3275 (1985).

     ii.   <u>Enterprise</u>

102. Here, all Defendant officers and employees of FCS are personally liable under RICO. All Defendants are actively engaged in a business organization whose common goal is the growing profitability and individual enrichment of all the parties, no matter the means. In *Boyle v. United States*, 556 U.S. 938, 940-41,

129 S. Ct. 2237, 2241 (2009) the United States Supreme Court stated:

> In instructing the jury on the meaning of a RICO "enterprise," the District Court relied largely on language in *United States v. Turkette*, 452 U.S. 576, 101 S. Ct. 2524, 69 L. Ed. 2d 246 (1981). The court told the jurors that, in order to establish the existence of such an enterprise, the Government had to prove that: "(1) There [was] an ongoing organization with some sort of framework, formal or informal, for carrying out its objectives; and (2) the various members and associates of the association function[ed] as a continuing unit to achieve a common purpose." App. 112. […] In light of these statutory features, we explained in *Turkette* that **"an enterprise includes any union or group of individuals associated in fact" and that RICO reaches "a group of persons associated together for a common purpose of engaging in a course of conduct."** 452 U.S., at 580, 583, 101 S. Ct. 2524, 69 L. Ed. 2d 246. Such an enterprise, we said, "is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *Id.*, at 583, 101 S. Ct. 2524, 69 L. Ed. 2d 246.

*Boyle v. United States*, 556 U.S. 938, 942, 129 S. Ct. 2237, 2242 (2009) (*emphasis added*).

103.  Here, all Defendants are part of a limited liability company which is a structured entity which operates according to a well-defined organizational hierarchy, subdivided in departments which all hold a specifically outlined function, and whose officers and employees all possess well-defined titles and duties. For this reason, it can be defined as an enterprise.

    iii.   <u>Predicate Acts</u>

- Fictitious Loan (unlawful debt) - Defendants agreed to impose a fictitious loan on employees, forcing the employee to pay taxes on monies that were taken from the employee. Said conspiracy and act of conversion, allowed Defendants to shift the tax burden of The Fine to the employee.

- Improper Fine Allocation - Defendants agreed to allocate part or all of the burden of The Fine to their employees, forcing the employee to pay taxes on monies that were taken from the employee. Said conspiracy and act of conversion allowed Defendants to shift the burden of The Fine payment to the employee. Said conspiracy and act of conversion allowed Defendants to transfer monies to the government in repayment of The Fine that were derived from imposing an unlawful debt/unjust burden on employees and using the tax code to force employees to pay the taxes, achieving a business tax deduction for Defendants in violation the DPA. Restrictive covenants are used to retaliate against employees, if they terminate employment, thus forcing them to remain employees and be forced to forfeit large portions of their income to FCS.

- Involuntary Charitable Contributions - Defendants agreed to impose "charitable contributions" on employees, forcing the employee to pay taxes on monies that were taken from the employee. Said conspiracy and act of conversion allowed Defendants to retain monies for their own

benefit and enrichment, or to use the funds to transfer monies to the government in repayment of The Fine. Said funds were derived from imposing an unlawful debt/unjust burden on employees.

- Other Creative Accounting - Defendants agreed to recoup monies from employees, forcing the employee to pay taxes on monies that were taken from the employee. Said conspiracy and act of conversion, allowed Defendants to shift the burden of The Fine payment to the employee. Said conspiracy and act of conversion allowed Defendants to transfer monies to the government in repayment of The Fine that were derived from imposing an unjust burden on employees and using the tax code to force employees to pay the taxes, achieving a business tax deduction for Defendants in violation the DPA.

- Transfer of Stolen Monies to Government – The alleged conspiracy and act of conversion allowed Defendants to transfer converted/stolen monies to the government in repayment of The Fine. Said monies were derived from imposing an unlawful debt/unjust burden on employees as described herein.

- Unjust Enrichment - Defendants engaged in the acts described above to ensure available revenue to pay the government fine and to ensure available revenue to pay its members and senior employees. The acts

31

described above were implemented and carried out to increase available tax-free cash to the Defendants, to enrich their own pockets and support the Defendants' business, namely FCS.

- Retaliation - Defendants threatened either implicitly or directly to enforce severe restrictive covenant if Plaintiff (or any employee) left employment regardless of the reason. Defendants threatened and stated they would, through all means available, enforce restrictive covenants, thereby eliminating Plaintiff's opportunity to work. Said acts are done as a retaliatory measure and to restrain trade and maintain their market share and anti-competitive advantage in narrow medical specialty.

iv.    <u>Pattern of Racketeering Activity</u>

104.   Racketeering activity is defined by statute, and it includes any act which is indictable under various federal criminal statutes. *See Johnson Enters. of Jacksonville v. Fpl Grp.,* 162 F.3d 1290, 1316-17 (11th Cir. 1998). For example, it includes extortionist credit transactions (18 U.S.C. § 891), obstruction of a criminal investigation (18 U.S.C. § 1510), conspiring to retaliate against any person for disclosing information in relation to the commission of a possible federal crime (18 U.S.C. § 1513), engaging in monetary transactions in property derived from specified unlawful activity (18 U.S.C. § 1957), but also mail fraud (18 U.S.C. § 1341) and wire fraud statutes (18 U.S.C. § 1343), as well as the

32

collection of unlawful debts. *See* 18 U.S.C. § 1961(a). Mail fraud or wire fraud "occurs when a person (1) intentionally participates in a scheme to defraud another of money or property and (2) uses the mails or wires in furtherance of that scheme." *See Pelletier v. Zweifel*, 921 F.2d 1465, 1498 (11th Cir. 1991). *See also Johnson Enters. of Jacksonville v. Fpl Grp.*, 162 F.3d 1290, 1317 (11th Cir. 1998).

105.   RICO requires the presence of a "pattern of racketeering activity." 18 U.S.C. § 1962.

> [Pattern of racketeering activity] of a section 1962(c) claim requires allegations (a) that the defendant committed at least two of the predicate racketeering acts listed in section 1961(1); (b) that there was relatedness among the predicate acts; and (c) that the multiple predicates "amounted to, or threatened the likelihood of, continued criminal activity."

*Lockheed Martin Corp. v. Boeing Co.,* 314 F. Supp. 2d 1198, 1218-19 (M.D. Fla. 2004).

106.   This analysis also requires proof of continuity:

> A showing that the predicate acts are "part of an ongoing entity's regular way of doing business" would, for example, satisfy the "continuity" requirement either in the case where the entity is a traditional criminal enterprise or with respect to an ongoing legitimate business.

*Jones v. Childers*, 18 F.3d 899, 911 (11th Cir. 1994).

107.   Here, Plaintiff poses that Defendants repeatedly violated RICO by conspiring

and engaging into various fraudulent activities and by collecting upon unlawful

debts. 18 U.S.C. § 1962(a)-(c).

108.   Defendants did not engage in merely two (2) predicate acts, rather they created

a sophisticated scheme whereby the created fictitious loans, improperly allocated

fines, imposed involuntary donations and recouped monies from their physician

employees post-tax, all the while hiding their acts through illicit tax machinations

for the purpose of repaying The Fine and/or enriching themselves. Defendants

paid the federal government monies that were illegally obtained.

109.   They did so repeatedly, monthly from the moment the DPA was signed in

April 2020, until Plaintiff's resignation/termination in August of 2021.

Defendants continue to employ the same scheme to remaining employees.

110.   To ensure success, multiple Defendants and other FCS employees discussed

the nefarious plan to implement the same. Many persons in an organization need

to act together to orchestrate such a complicated scheme. It is proven by the email

correspondence included in the evidence that multiple individuals are to blame.

Hence, Defendants are also liable for conspiring to violate RICO. 18 U.S.C. §

1962(d).

111.   As a result of Defendants' actions Plaintiff lost in excess of Four Hundred

Thousand Dollars ($400,000.00), employment, and irreparable damage to his

reputation and standing in the community. Plaintiff has undergone significant

34

pain and suffering as well mental stress and anxiety. Defendants' actions are not only the proximate cause of Plaintiff's injuries, but they are also the direct cause of Plaintiff's injuries.

112.   The proceeds of said conduct was used in part to pay the government fine, imposed by the DPA, and transmitted electronically using the interstate banking system.

### b. Damages & Injunctive Relief

113.   Under RICO, Plaintiff shall recover threefold the damages sustained and the cost of the suit, including a reasonable attorney's fee. 18 U.S.C. § 1964(c).

114.   Here, Plaintiff suffered harm in excess of Four Hundred Thousand Dollars ($400,000.00) and therefore is entitled to three times of that amount, plus compensatory damages and costs and attorney fees.

115.   At any time, the Court can also impose injunctions or whatever other actioned deemed proper. 18 U.S.C § 1964(b). Additionally, pursuant to Fed. R. Civ. P. 65, this Court may issue a temporary restraining order or injunction if: a verified complaint clearly shows that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and upon certification that notice was provided and why it should not be required.

116.   Plaintiff satisfied the elements for preliminary injunction. *See Hernandez v. Bd. of Regents by Univ. of S. Fla.,* 11 Fla. L. Weekly Fed. D 60 (U.S. M.D. Fla.

1997).

117. The evidence shows that Defendants conspired to violate RICO by engaging in several predicate acts over the span of two (2) years. Therefore, Plaintiff is likely to succeed on the merits.

118. FCS demonstrates a clear pattern of disregard for authority and the laws of this country. Evidence proves that FCS will stop at nothing to seek competitive advantage, and this is not limited to Southwest Florida, rather expand to all their physician employees across the state. Threat of injury to Plaintiff outweighs the potential harm that may be suffered by FCS as previously described above.

119. The circumstances of this case prove that enjoining FCS from enforcing the restrictive covenants would not be adverse to public interest. FCS has proven complete disregard for authority and the laws of this country as well as complete disregard for the continuity of care of their patients. In the interest of justice and fairness, and for the safety of the public, injunction is the only way.

WHEREFORE, Plaintiff asks this honorable Court to find that Defendants conspired to violate RICO. That Plaintiff is entitled to compensatory damages, treble damages, cost and reasonable attorney's fees as well an injunctive relief prohibiting the enforcement of any and all restrictive covenants of any nature; and from speaking ill of Plaintiff in an attempt to harm his credibility and standing in the medical community.

WHEREFORE, Plaintiff also demands punitive damages. The actions of Defendants are egregious, shock the conscious of any reasonable person and are designed to continue the enforcement of unlawful means to accumulate post tax monies from Plaintiff and all physician employees.

### <u>COUNTY IV – VIOLATION OF FDUTPA</u>
### (As to All Defendants)

120.   Plaintiff realleges and incorporates by reference, as if fully set forth herein, the allegations in Paragraphs 1 through 59 above.

121.   Florida's Deceptive and Unfair Trade Practices Act, ("FDUTPA"), prohibits "unfair methods of competition," "unconscionable acts or practices," and "unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla Stat. §501.204.

### *a.  Elements of FDUPTA*

122.   Any party who is affected by the unfair or deceptive practice can file a claim, this includes competitors and legitimate business owners, not only consumers. Fla. Stat. § 501.202(2); Fla. Stat. § 501.203(6) and *Wyndham Vacation Resorts, Inc. v. Timeshares Direct, Inc*., 123 So. 3d 1149, 1152 (Fla. 5th DCA 2012).

> One purpose of FDUTPA is to protect "the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." § 501.202(2) (emphasis added). This section, by legislative directive, is

to be construed liberally to promote the above policy. § 501.202. […] "the Florida Legislature's replacement of the word consumer with the word person, demonstrates an intent to allow a broader base of complainants, including competitors such as [the appellant], to seek damages." (Emphasis omitted.) In *Niles Audio Corp*, the court found that the appellant could bring a claim for both damages and declaratory relief pursuant to section 501.211. *Id.* at 1320; see also *In re G-Fees Antitrust Litig.*, 584 F. Supp. 2d 26, 44 (D.D.C. 2008) (finding that the 2001 amendment allowing a damages action by any "person" eliminated the requirement that an action for damages had to be brought by a consumer); *Furmanite Am., Inc. v. T.D. Williamson, Inc.*, 506 F. Supp. 2d 1134, 1146-47 (M.D. Fla. 2007) (holding that plaintiff had standing to bring FDUTPA claim for damages against the defendant, a competitor, for the misappropriation of trade secrets and confidential information). We agree that section 501.211(2) evinces a legislative directive that the remedy of damages is not limited to a consumer.

*Bailey v. St. Louis*, 196 So. 3d 375, 382-83 (Fla. 2d DCA 2016).

123.   Under Florida law, a practice can be deemed unfair or deceptive if a reasonable prudent person would have been likely deceived. The language of the Act contemplates applicability if the actions are in violation of another federal or state law which regulates commerce. Fla. Stat. § 501.203(3)(c). Under FDUTPA, to prove whether a practice is misleading, the courts do not look as to whether the statement is actually false, rather, they look as to whether a reasonable prudent person would be misled. *See Porsche Cars N. Am., Inc. v. Diamond*, 140 So. 3d 1090, 1096 (Fla. 3d DCA 2014).

124.   Based on the above, Plaintiff has standing to sue Defendants under FDUTPA. Defendants have a documented history of anti-competitive behavior sought intentionally for personal gain. Even when discovered by the federal government and punished through the DPA, Defendants sought to continue in their nefarious behavior, avoid punishment, and hold employees like Plaintiff hostage through non-compete agreements which resulted in actual harm to Plaintiff. *See Dorestin v. Hollywood Imps., Inc.,* 45 So. 3d 819, 824-25 (Fla. 4th DCA 2010).

### b.   *Damages & Injunctive Relief*

125.   To recover under FDUTPA, a Plaintiff must also prove actual damages. Fla. Stat. § 501.211. *See Rollins, Inc. v. Heller*, 454 So. 2d 580, 585 (Fla. 3d DCA 1984). The Act does not provide a private cause of action for "feelings of disappointment." *Id.*

126.   As a result of Defendants' actions Plaintiff lost in excess of Four Hundred Thousand Dollars ($400,000.00) as well as employment and irreparable damage to his reputation.

127.   Defendants continue to undermine his ability to continue to work with Advent Hospital.

128.   Defendants are working to force Advent Hospital to either remove him from the medical staff or discipline him for not taking call.

129.   Defendants are using the restrictive covenants to prevent Plaintiff from taking

call; irreparably harming his ability to practice medicine and his standing in the community.

130.   If Plaintiff is removed from the medical staff, his medical license will be in serious jeopardy by the Florid Board of Medicine.

131.   He would be reported to the National Practitioner Date Bank and consequently his Medicare/Medicaid (government insurance) billing privileges would be denied.

132.   In short, Plaintiff's entire life would be uprooted and his profession of being a medical oncologist serving some of the most ill persons in our community would be ended.

133.   But for the egregious actions of Defendants, Plaintiff would not have been constructively forced out of Defendant FCS, and consequently the irreparable harm to his practice, his family and himself would not be taking place.

134.   All Defendants are conspiring to harm Plaintiff and conspired to impose the unlawful debt/loans on Plaintiff to repay a government debt and/or to enrich themselves.

135.   Pursuant to Fed. R. Civ. P. 65, this Court may issue a temporary restraining order and injunctive relief if: a verified complaint clearly shows that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and upon certification that notice was

provided and why it should not be required.

136.   Plaintiff satisfied the element for preliminary injunction, *supra*. *See Hernandez v. Bd. of Regents by Univ. of S. Fla.*, 11 Fla. L. Weekly Fed. D 60 (U.S. M.D. Fla. 1997).

WHEREFORE, Plaintiff asks this honorable Court to find:

137.   Defendants engaged and conspired to engage in deceptive unfair trade practices;

138.   Plaintiff suffered irreparable injury;

139.   Plaintiff has a likelihood of success;

140.   The interest of the public would be served with a permanent injunction against Defendant FCS' enforcement of restrictive covenants; and

141.   That Plaintiff is entitled to compensatory damages, cost and attorneys' fees.

## <u>COUNT V – BREACH OF EMPLOYMENT CONTRACT</u>
### (As to All Defendants)

142.   Plaintiff realleges and incorporates by reference, as if fully set forth herein, the allegations in Paragraphs 1 through 65 above.

### a. *Elements for Breach of Contract*

The elements of a breach of contract action are: (1) a valid contract; (2) a material breach; and (3) damages

*Sulkin v. All Fla. Pain Mgmt.,* 932 So. 2d 425, 426 (Fla. Dist. Ct. App. 2006) (*internal citation omitted).*

143.   Here, a valid employment contract exists which was signed by both parties on March 31, 2019. (**Exhibit B**).

144.   The Employment Contract was breached by Defendants as follows:

   1) FCS created and imposed a fictitious loan which reduced Plaintiff's bonus after taxes;

   2) FCS improperly assessed a fine against Plaintiff, collecting money post-tax to partially repair a fine assessed by the government prior to his employment;

   3) FCS arbitrarily imposed monthly charitable contributions to their own foundation as an expense;

   4) FCS failed to pay Plaintiff the specified minimum compensation of Four Hundred Seventy-Five Thousand Dollars ($475,000) per year;

   5) FCS engaged in retaliatory acts against Plaintiff; and

   6) FCS engaged in other unlawful recoupment of monies from Plaintiff.

### b. Damages

145.   As a result of Defendants' actions Plaintiff lost in excess of Four Hundred Thousand Dollars ($400,000.00) as well as employment and his reputation and standing in the community has been harmed by FCS actions.

146.   Defendants conspired and violated the Employment Agreement when they created fictitious loans, improperly allocated The Fine, imposed charitable

contributions against Plaintiff's will, as well as recouped other monies unlawfully thus significantly reducing Plaintiff's earning below the agreed upon amount. (**Exhibit B**). Therefore, Plaintiff is likely to succeed on the merits.

147.   As a result of these egregious acts by FCS they should be restrained from enforcing the restrictive covenants outlined in the contract.

WHEREFORE, Plaintiff asks this Honorable Court to find Defendants breached the Employment Agreement. Furthermore, Plaintiff seeking compensatory and punitive damages, as well as the full benefit of the contract, plus attorneys' fees and costs.

### COUNT VI - CONVERSION
### (As to All Defendants)

148.   Plaintiff realleges and incorporates by reference, as if fully set forth herein, the allegations in Paragraphs 1 through 65 above.

***a.  Elements of Conversion***

149.   FCS was solely responsible for the monetary penalty imposed by the DPA and conspired to shift the tax burden of the penalty onto Plaintiff, they are liable for conversion:

> In other words, "to state a claim for conversion, one must allege facts sufficient to show ownership of the subject property and facts that the other party wrongfully asserted dominion over that property." *Edwards*, 51 So. 3d at 1213. For instance, a conversion of property may occur when "a person with a right to possess property demands its return,

and the demand is not or cannot be met."

*Spradley v. Spradley*, 213 So. 3d 1042, 1044 (Fla. Dist. Ct. App. 2017) (*internal citations omitted).*

150. Here, the evidence shows that Defendants conspired and acted to systematically reduce Plaintiff's earnings when: 1) they created and imposed a fictitious loan which reduced Plaintiff's bonus after taxes; 2) they improperly assessed a fine against Plaintiff's clinic's expenses after taxes, thus reducing his salary; and 3) they arbitrarily imposed, without permission by Plaintiff, monthly charitable contributions to their own foundation as an expense.

### b. Damages

151. As a direct result of Defendant's action Plaintiff lost in excess of Four Hundred Thousand Dollars ($400,000.00) of monies unlawfully taken by FCS.

WHEREFORE, Plaintiff asks this Honorable Court to find Defendants engaged in conversion of Plaintiff's monies; and award, against all Defendants, compensatory, punitive, and treble damages, plus costs and attorneys' fees.

### COUNT VII – FLORIDA WHISTLEBLOWER ACT VIOLATION & RETALIATION

152. Plaintiff realleges and incorporates by reference, as if fully set forth herein, the allegations in Paragraphs 1 through 65 above.

### a. Elements of Retaliation

153.   As explained above, Defendants retaliated against Plaintiff:

> To establish a prima facie claim for retaliation under section 760.10(7), a plaintiff must demonstrate that: (1) he or she engaged in statutorily protected activity; (2) he or she suffered an adverse employment action; and (3) there is a causal relation between the two events.

*Tequesta v. Luscavich*, 240 So. 3d 733, 738 (Fla. Dist. Ct. App. 2018) *(internal citations omitted).*

154.   Here, Plaintiff repeatedly asked Defendants to explain themselves as to why he was responsible for a loan which was not part of his employment agreement as well as a fine assessed against all physician employees for the repayment of The Fine that was solely imposed on FCS. He also openly contested the involuntary charitable donation to FCS's foundation which he did not authorize. Then, when he refused to sign a New Employment Agreement, Defendants retaliated.

155.   The Florida Whistleblower Act ("FWA") prohibits employers from acting against employees for refusing to engage in unlawful activity or be subjected to unlawful activity:

> [U]nder section 448.102(3), which provides that "[a]n employer may not take any retaliatory personnel action against an employee because the employee has . . . [o]bjected to, or refused to participate in, any activity, policy, or practice of the employer which is in violation of a law, rule, or regulation." A claim under section 448.102(3) requires the plaintiff to prove "(1) []he

> engaged in statutorily protected expression; (2) []he suffered an adverse employment action; and (3) the adverse employment action was causally linked to the statutorily protected activity."

*Kearns v. Farmer Acquisition Co.*, 157 So. 3d 458, 462 (Fla. Dist. Ct. App. 2015)

(*internal citation omitted*); *See also* Fla. Stat. § 448.102

156.   Plaintiff had every right to ask about the significance of the loan or The Fine assessed as well as their tax implications. However, threatened to be discovered Defendants quickly sought to punish Plaintiff by recouping monies he lawfully earned.

157.   Because of this retaliatory action, Plaintiff had no choice but to resign and did so in July of 2021. However, in retaliation, FCS through their CEO, Defendant Nathan Walcker, responded on August 2, 2021, with a Termination Letter stating that Plaintiff was being fired for breach of contract for alure to provide ninety (90) days' notice. FCS also sought to enforce the restrictive covenants listed in the Employment Agreement and clearly demonstrated intent on further damaging Plaintiff by restricting his ability to find employment elsewhere and damage his reputation by rejecting his resignation and instead terminating him.

158.   Defendants intentionally withheld Plaintiff's last paycheck in retaliation for Plaintiff's questioning and arguing the actions of Defendants in enforcing the loan repayments, etc. were unlawful.

159.   Defendants also called Advent Hospital and told them that Plaintiff had resigned from the medical staff and all medical staff appointments. Said act was done as a retaliatory measure for Plaintiff disputing the illegal activity.

160.   Plaintiff had every right to refuse to engage in conduct which he reasonably perceived to be unlawful and refuse to sign a New Employment Agreement and resign.

### b. Damages

161.   Plaintiff is entitled to damages as prescribed by law:

> When a plaintiff prevails on a private-sector FWA claim, "the court may order relief" in the form of, inter alia, "[c]ompensation for lost wages, benefits, and other remuneration" and "[a]ny other compensatory damages allowable at law." § 448.103(2)(d)-(e), Fla. Stat. (2005). The plain and unambiguous language of section 448.103(2)(e) "authorizes the court to award compensatory damages" without limitation to mere "economic damages," since any other interpretation "would render the catch-all provision of subsection (e) meaningless." *Wood v. Cellco P'ship*, No. 8:06-CV-687-T-27TBM, 2007 U.S. Dist. LEXIS 96133, 2007 WL 917300, at *5 (M.D. Fla. Mar. 23, 2007). As a result, given the FWA's liberal construction, damages in the form of emotional distress are recoverable under section 448.103(2)(e) as a form of compensatory damage. *Cf. Scott v. Otis Elevator Co.*, 572 So. 2d 902, 903 (Fla. 1990) (explaining, within the context of the worker's compensation anti-retaliation provision, that wrongful discharge suits sound in intentional tort, making "damages for emotional distress . . . recoverable"). Thus, even if Aery were not entitled to lost wages, his suit still could proceed on the theory that the wrongful discharge caused

him mental anguish.

*Aery v. Wallace Lincoln-Mercury, LLC*, 118 So. 3d 904, 913 (Fla. Dist. Ct. App. 2013)

162. Here, the evidence shows that Defendants conspired and violated the Employment Agreement when they created fictitious loans, improperly allocated The Fine, imposed charitable contributions against Plaintiff's will, as well as recouped other monies unlawfully thus significantly reducing Plaintiff's earning below the agreed upon amount. (**Exhibit B**). Therefore, Plaintiff is likely to succeed on the merits.

WHEREFORE, Plaintiff asks this Honorable Court to find Defendants engaged in retaliation against Plaintiff for refusing to go along with unlawful and questionable actions and award compensatory, punitive, and treble damages, as well as attorneys' fees and cost.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully request a judgment against Defendant's as to all counts, and damages as follows:

1) compensatory damages;

2) treble damages;

3) punitive damages;

4) cost and reasonable attorney's fees;

48

5) injunctive relief preventing FCS from enforcing any restrictive covenant contained in the employment contract, and from taking any act that inhibits Plaintiff's ability to practice Oncology/medicine in any location he chooses.

6) all other remedies this Court deems just and equitable.

## <u>REQUEST FOR TRIAL BY JURY</u>

Plaintiff respectfully requests a trial by jury on all issues so triable.

Respectfully Submitted,
CHAPMAN LAW GROUP

Dated: August 18, 2021          */s/ Ronald W. Chapman Sr.*
Ronald W. Chapman Sr., M.P.A., LL.M.
FL Bar No.: 646636
Sara A. Bazzigaluppi, Esq.
FL Bar No.:1108266
6841 Energy Ct.
Sarasota, FL 34240
(941) 893-3449
rchapman@chapmanlawgroup.com
sbazzigaluppi@chapmanlawgroup.com

49